IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 25, 2024 Session

**STATE OF TENNESSEE v. KEITH HARDING MILLER**

**Appeal from the Circuit Court for Rhea County**
**No. 2020-CR-219     Justin C. Angel, Judge**

_____

**No. E2023-00624-CCA-R3-CD**

_____

The Defendant, Keith Harding Miller, was convicted by a Rhea County Circuit Court jury of aggravated assault with a deadly weapon, a Class C felony. *See* T.C.A. § 39-13-102(A)(1)(A)(iii) (Supp. 2019) (subsequently amended). The trial court sentenced him to three years in the Department of Correction. On appeal, he contends that: (1) the State violated *Brady v. Maryland* by failing to disclose material evidence, (2) a juror imparted extraneous information which impacted the verdict, and (3) the trial court erred in denying judicial diversion and in imposing incarceration. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ, J., joined. JAMES CURWOOD WITT, JR., J.,[1] not participating.

Tyler M. Caviness (on appeal and at sentencing and motion for new trial), Knoxville, Tennessee; and Tim D. Hewitt (at trial), Cleveland, Tennessee, for the appellant, Keith Harding Miller.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Courtney Lynch, District Attorney General; David Shinn, Mike Taylor, and Kandi Nunley, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] The Honorable James Curwood Witt, Jr., died on August 17, 2024, and did not participate in this opinion. We acknowledge his twenty-seven years of faithful service to this court.

## OPINION

The Defendant's conviction stems from June 4, 2020 events which transpired when police responded to a 9-1-1 call regarding a domestic disturbance at the Defendant's home. The Defendant possessed a gun as officers attempted to intervene and subdue him. During the incident, Rhea County Sheriff's Officer Eric McMillan erroneously believed he had been shot, although the evidence at the trial showed that he was injured when he was cut by a broken mirror. The Defendant was charged by indictment with aggravated assault of his wife, Dawn Miller; two counts of domestic assault of Ms. Miller; and two counts of aggravated assault of two law enforcement officers, Eric McMillan and Sarah Freels. At the trial, the court granted the motion for judgment of acquittal as to all counts except the aggravated assault of Officer McMillan. The jury found the Defendant guilty of the surviving charge, and this conviction forms the basis of the present appeal.

The Defendant's wife and son testified about the events in the household which precipitated the son's 9-1-1 call. Their testimony established that the Defendant and his wife had been arguing since the previous day and that the Defendant's wife drank alcohol and took medication to sleep and avoid further conflict. The Defendant had been angry and had engaged in target practice earlier in the day on June 4, 2020. During the arguments, the Defendant's wife asked the Defendant's son to call 9-1-1. The Defendant's son was upstairs in his bedroom during the incident that occurred after the police arrived. The Defendant's son saw a broken mirror inside the home after the incident, and a photograph of the mirror was received as an exhibit during the son's testimony.

The Defendant's wife testified that she had gone to sleep by the time the police arrived but that the Defendant woke her and said she needed to talk to the police because they were not going to leave without speaking to her. She said that the Defendant helped her out of bed and that she walked to the back door to talk to the police. She remembered seeing a police officer standing outside the window when she was still in the bedroom but did not recall speaking to the officer. She said she sat on the porch while the police officers entered the home. She did not recall having told the police that the Defendant had threatened to kill her and her son and said she did not know why she would say this. She said she had never been afraid of the Defendant. She said that, to her knowledge, the Defendant had not been drinking on the night of June 4, 2020.

The Defendant's wife testified that she had a red mark on her neck from the Defendant's chokehold and that she had bruises from falls during the June 4, 2020 incident. She said she never heard a gunshot when she was on the porch. She said that while she sat on the porch, she could not hear what happened inside the house.

The parties stipulated that no bullets or "hull" were found when the authorities executed a search warrant at the Defendant's home on June 10, 2020.

Rhea County Sheriff's Officer Eric McMillan testified that he responded to the Defendant and Ms. Miller's home around 10:15 p.m. on June 4, 2020, regarding a domestic violence call. He said he was dressed in his sheriff's department uniform. He said he encountered the Defendant when Officer McMillan stepped onto the back porch. Officer McMillan said the Defendant looked through the blinds on the porch door and told him that he was on private property and that he needed to leave. Officer McMillan said the Defendant closed the blinds. Officer McMillan described the Defendant's tone as agitated and aggressive. Officer McMillan said he did not get the chance to speak before the Defendant told him to leave.

Officer McMillan testified that he heard the Defendant walking away from the door. Officer McMillan said he knocked on the door and stated that he had a job to do and that he had to speak to everyone. Officer McMillan said the Defendant asked if Officer McMillan wanted to speak to his wife. Officer McMillan said that, when he responded affirmatively, the Defendant said Officer McMillan could speak to her through a window.

Officer McMillan testified that he walked to a window, shined his flashlight inside the house, and saw the Defendant and the Defendant's wife. Officer McMillan said the Defendant pointed to his wife, who lay in a bed. Officer McMillan said that she looked at his flashlight and that she said, "Help me." He said she was crying and upset and that he was able to hear what she said through the window. He said he walked to the end of the driveway to speak with Dayton Police Officer Eric Swafford,[2] who had just arrived.

Officer McMillan testified that he and Dayton Police Officer Freels went to the porch door and that Officer Swafford went to the front of the house where Officer McMillan had seen Ms. Miller. He said Ms. Miller opened the door and was crying and hysterical but did not appear to be intoxicated. He did not see the Defendant, and Ms. Miller said that the Defendant was in a bedroom and that she did not know where her son was. Officer McMillan said that the officers handcuffed Ms. Miller "for safety" and had her sit and that communication with her was difficult.

Officer McMillan testified that he entered the home and went to the area where he had first seen Ms. Miller and that Officer Freels followed him into a hallway. He said he saw a mirror in the hallway, but he could not recall whether it was "intact" at the time. He said he assumed, based upon Ms. Miller's statement about the Defendant's whereabouts, that he was behind a hallway door in the back bedroom. Officer McMillan said that the bedroom door was locked and that he announced loudly that he intended to kick the door. He acknowledged that he did not ask the Defendant to unlock the door or to come out with

---

[2] Officer Swafford was a Dayton Police officer on the date of the incident involving the Defendant but was employed as a Rhea County Sheriff's deputy when he testified at the trial.

his hands up. Officer McMillan said that after he did not hear a response, he kicked the door, which did not open. He kicked the door a second time, and it opened halfway. He said that he held a Taser and a flashlight in his hands and that Officer Freels stood behind him with her gun drawn. Officer McMillan said he shined his flashlight into the room and saw the Defendant "charging" toward him "raising a black pistol." Officer McMillan said that he was in a "fatal funnel," meaning he had no route of escape, and that he was afraid he would die. He said he and Officer Freels both yelled, "Gun," and ran. He said he did not hear anything as he fled and denied hearing a gunshot or breaking glass. He described the Defendant's gun as either a .40-caliber or 9-millimeter Glock "long slide" and said it was the same style as his service weapon. He acknowledged that he told the emergency room doctor that he did not know the caliber.

Officer McMillan testified that when he reached the kitchen, he felt something cold run down his leg, which he discovered was blood. He said he told Officer Swafford, who was in the kitchen, that he thought he had been shot. He said he went outside at Officer Swafford's direction, where Officer Freels administered first aid. Officer McMillan said that he was taken by ambulance to a hospital and that he missed two months of work due to his injury.

Officer McMillan identified photographs of the interior of the Defendant's home, and they were received as exhibits. The photographs depicted the bedroom door, the bedroom, and the kitchen. When shown one of the photographs, he said he did not know if "this glass" was what caused his injuries.[3] He identified photographs of the pants he wore on the night of the incident, and he agreed that the testing of the pants for gunshot residue was negative, with glass being found on the pants.

Officer McMillan testified that he gave statements to Detective Chris Hall and an unidentified Tennessee Bureau of Investigation (TBI) officer or officers. Officer McMillan said he was not involved in the decision for the Defendant to be charged with attempted "criminal homicide" and did not know if his statements were used in the decision. Officer McMillan did not recall having seen the affidavit of complaint in the Defendant's general sessions court case.

The parties stipulated that no bullet, shell casing, or bullet hole was found when the authorities executed a search warrant at the Defendant's home.

Dayton Police Officer Sarah Freels testified that she and Officer McMillan responded to a report of a domestic disturbance at the Defendant's home on June 4, 2020. She said she spoke with Officer McMillan and Officer Swafford, who had also just arrived,

---

[3] The exhibit which was shown to the witness was not identified in the transcript. One of the photographs depicted a broken mirror.

at the end of the driveway before "Eric"[4] knocked on a door to the home and had the Defendant "shut the door in his face." Officer Freels said she and the other officers walked to a door, where the Defendant's wife met them. Officer Freels described the Defendant's wife as "very torn[, v]ery hysterical[,] crying[, and] asking for help." Officer Freels decided to handcuff the Defendant's wife to "contain her to one spot." Officer Freels said that the Defendant's wife told the officers that the Defendant probably had a gun and that the officers drew their weapons as "safety precautions."

Officer Freels testified that she and the other officers entered the home and that she and Officer McMillan approached the back bedroom which the Defendant's wife had identified to be the Defendant's location. She said she and Officer McMillan entered a dimly lit hallway, and she denied seeing a mirror. She said that they came to a closed door and announced their presence and that Officer McMillan kicked the door, which moved slightly and was barricaded. She said Officer McMillan kicked the door again and that it opened enough for them to see inside the room, which was dimly lit. She said she saw nothing for a couple of seconds, then saw the Defendant inside the room a couple of feet from the door. She said the Defendant held a black handgun and "was starting to uphold the weapon." She said she and Officer McMillan ran from the hallway. She said that as they left, she heard a loud noise, which sounded more like a gunshot than shattering glass. She said that Officer McMillan was bleeding and that they concluded he must have been shot. She said that she attended Officer McMillan until emergency medical responders arrived and that she had no further involvement with the events in the home.

Former Rhea County Sheriff's Officer Eric Swafford, who was working as a Dayton Police officer at the time of the trial, testified that he, Officer McMillan, and Officer Freels responded to the scene of a reported domestic assault on June 4, 2020. He said he walked to the back of the house while the other officers went to the front. He saw the Defendant close the blinds, and Officer Swafford walked to the front of the home. Officer McMillan said he heard the Defendant's wife yelling, "[H]elp me, help me, help me," from the front porch. He said he and the other officers entered the front door. He said that Officer McMillan had his Taser drawn and that Officer Freels had her "firearm" drawn.

Officer Swafford testified that he was standing by a wall where the hallway and the kitchen met when Officer McMillan kicked in the bedroom door. He said he did not see Officer McMillan kick the door but saw Officers McMillan and Freels coming out of the hallway and yelling, "[G]un." Officer Swafford said he heard what sounded like a gunshot and "back[ed] up holding cover on . . . the doorway" to the bedroom as Officers McMillan and Freels passed by him through the kitchen. Officer Swafford thought the sound he suspected was a gunshot came from the bedroom. Officer Swafford said Officer McMillan

---

[4] Both Deputy McMillan and Officer Swafford have the first name "Eric."

stated, "I think I got hit," touched the back of his leg, and held up his hand, which was covered in blood. Officer Swafford saw blood on the back of Officer McMillan's pants and told the other officers to go outside.

Officer Swafford testified that the Defendant loudly stated, "If anybody comes back in here[,] there're going to get hurt." Officer Swafford said Rhea County Sheriff's Officer Jesse Wilkey stood outside the door to the home and spoke to Officer Swafford about how to proceed. Officer Swafford said the Defendant asked, "Do you want to talk to me?" and came out of the bedroom with his hands up. Officer Swafford said "we" took the Defendant into custody, after which Officer Wilkey located the Defendant's son in an upstairs bedroom. Officer Swafford stated that several members of the SWAT team lifted the Defendant, who refused to walk, and carried him out of the house.

Rhea County Sheriff's Detective Mike Bice testified that he responded to a domestic assault call on June 4, 2020. He said he saw Ms. Miller kneeling beside a vehicle tire and introduced himself to her. He said she responded, "I know who the F you are. Get my son out of the house. He's going to kill us." He described Ms. Miller as "just frantic" and said she "was just screaming and carrying on." Detective Bice said he and other officers entered the home and found the Defendant on his knees in the area between the kitchen and dining room. Detective Bice said the Defendant asked, "What the F you looking at? You wanting to do something?" Detective Bice said he responded, "Yes, sir. We're doing it. You're under arrest. Get up." Detective Bice said the Defendant repeated, "F you," and two officers lifted the Defendant and carried him outside to a police car. Detective Bice said that the Defendant would not walk, that the officers had to carry the Defendant "a pretty long way" down the driveway, and that the officers carrying the Defendant fell at some point when carrying the Defendant on the driveway. Detective Bice said he did not assault the Defendant or see other officers assault the Defendant. He agreed that the Defendant had blood on his forehead in his booking photograph and that the Defendant was treated at a hospital for a concussion "[a]t a later date."

Rhea County Sheriff's Sergeant Wayne Cox identified photographs of a Glock handgun he found in a dresser drawer in a bedroom in the Defendant's home shortly after the Defendant was removed from the home. Sergeant Cox agreed that the bedroom was in disarray and that "some furniture" was by the bedroom door.

Rhea County Sheriff's Detective Chris Hall testified he arrived at the Defendant's home as the Defendant was being carried out on June 4, 2020. Detective Hall said that he found a Glock box on top of the dresser in a bedroom and that the box contained a loaded magazine and "loose rounds." He also found two or three additional magazines inside the dresser by the bedroom door. The gun, magazines, bullets, and photographs of the bedroom were received as exhibits. The photographs of the bedroom showed overturned furniture near the door.

Detective Hall testified that he sent Officer McMillan's pants to the TBI Laboratory for analysis, which revealed the presence of glass fragments but no evidence of gunshot residue. He agreed that, after the results of the gunshot residue testing were obtained, the police concluded that no evidence existed to prove that a gun had been fired.

Detective Hall testified that he interviewed the Defendant on June 5, 2020. He said the Defendant agreed to waive his *Miranda* rights. A recording of the interview was played for the jury. In the interview, the Defendant inquired, "How's the officer doing?" After Detective Hall said the officer was "okay," the Defendant stated: The Defendant and his wife had argued all day. He worked outside to stay away from her but checked on her periodically because she had been suicidal recently. He said he came inside around sundown, grilled steaks, and called his son to come for dinner. The Defendant said he attempted to wake his wife, who was unresponsive. He said he had to pick her up and shake her. He said he smelled alcohol and suspected she had taken pills. He said that she was intoxicated and unable to stand and that she stated she was going to kill herself. The Defendant said his wife tried to get his medication and a gun. He said that he threw his medication into a closet, that he located his gun, and that he searched unsuccessfully for his wife's gun. He said that a police officer came to the back door and that the officer wanted to enter the home. The Defendant said that he told the officer that he would have his wife come to the back door but that she would not do so. The Defendant said he told the officer to go to the bedroom window to talk to the Defendant's wife. The Defendant said the officer told the Defendant to come outside, which the Defendant refused to do but offered to send his wife outside to the officer. The Defendant said he had to assist his wife to the door.

In the interview, the Defendant said he returned to the bedroom, pushed a table against the bedroom door, and sat on the floor in front of the table. He said someone kicked the bedroom door, which was when he realized officers were inside the home. He said he pushed "the stuff back up against" the door. He said he asked "them" to leave him alone and stated that he had not tried to hurt anyone and had just tried to keep his wife from killing herself. He said he unloaded his gun and put it into a drawer and sat on the floor. He said he reiterated to the officers that he wanted to be left alone and that he had not tried to hurt anyone and had only tried to prevent his wife from killing herself. He said he called his mother and told her that he was probably going to jail and would "bail out" tomorrow. He said his brother-in-law called him and stated that he had heard domestic violence had occurred at the Defendant's home and that an officer had been shot. He said the call from his brother-in-law was five to ten minutes after the officer had kicked the door. The Defendant said he told his brother-in-law that he had not shot anyone and did not know a gun had been fired. The Defendant said he turned on the lights, opened the bedroom door, and stated that he had not shot anyone and did not want anyone to get hurt. He later said

he thought the room had been dark until this point but was uncertain. The Defendant said he complied with the officers' commands to leave the bedroom.

In the interview, the Defendant said that the officers handcuffed him and that Detective Bice stated that he wished the Defendant had not surrendered. The Defendant said that he was on his knees, that Detective Bice said something else the Defendant could not recall, and that when the Defendant turned his head to Detective Bise, an officer punched the back of the Defendant's head with his fist and told him to stand. The Defendant said that when he tried to stand, about four officers began "beating the h---" out of him. He said an officer held him by his hair and slammed him into a door facing, which "busted" the Defendant's head. He said the officers screamed and cursed at him to stand and continued to assault him. The Defendant said the officers dragged him across the driveway.

In the interview, the Defendant said he could not understand why the officers were as mad as they were over his arguing with his wife. He said that when he was inside a patrol car, he heard from the radio that an officer was being transported by ambulance to a hospital. The Defendant said that he did not know what happened, that he thought the gun must have gone off and he must have "done it," and that the gun might have discharged when he opened the door. He said he felt "totally responsible for what happened" but stated he did not know what had happened. He said he took his prescribed narcotic and other medications but had not been drinking on June 4, 2020. He said that, in retrospect, he wished he had come out of the bedroom when he had been asked. He said he was sorry for what had happened and claimed it was "a horrible accident."

When asked in the interview why he had barricaded himself in the bedroom, the Defendant said he wanted to be left alone and knew he was going to go to jail. When asked how he knew he was going to be taken to jail, he said he had his wife's cell phone and knew his wife had asked their son to call 9-1-1. He said he never found his wife's Glock 9-millimeter handgun and said his "Glock 40" had been in a drawer, not in a box on top of the dresser. He acknowledged that he had shot his pistol from his deck into a dirt pile earlier in the evening of June 4, 2020. He acknowledged he had held the pistol in his hand when the officer kicked the bedroom door but denied sticking the pistol out the door. He said he held the gun when the officer kicked the door because it had been on the bedroom floor and he had picked it up to put it away. He acknowledged that he had experienced suicidal thoughts in the past but denied that he had considered provoking the police to harm him on June 4. He stated repeatedly that he had no intent to hurt anyone and that he was sorry an officer had been injured. He acknowledged that he and his wife had pushed and shoved each other when he tried to prevent her from harming herself but denied he attempted to strangle her.

-8-

In the interview, the Defendant stated that he had been told he was charged with three counts of attempted murder and inquired who the two other officers were. He said he understood he had shot one officer but denied any intent to do so. When told two other officers had been present, he said he had not known they were there and inquired if they had been injured. He said he had not seen a flash or heard a gunshot but guessed it had fired when he held the door after an officer kicked the door. He said, "I deserve whatever I get."

After the recording of the interview was played, Detective Hall acknowledged that the interview had taken place on the day after the Defendant's arrest. Detective Hall agreed that the Defendant had "accepted the charge that he shot an officer," despite his not knowing how it happened. When asked, "And we now know that it's not true that [the Defendant] shot an officer," Detective Hall replied that he did not "have enough evidence to prove that there was a shot fired." He acknowledged the prosecutor's "stipulation" that the State believed at the time of the trial that no shot had been fired and did not recall the prosecutor's having said in his opening statement that Officer McMillan cut himself on a mirror. Detective Hall said that, at the time he interviewed the Defendant on June 5, 2020, he knew Officer McMillan's injuries were minor. Officer McMillan said the Defendant's clothing was not examined for the presence of gunshot residue because the Defendant's son told the police that the Defendant had fired a gun "all evening."

Detective Hall identified a search warrant for the Defendant's home, and it was received as an exhibit. The prosecutor stated that the State would stipulate "that there was no evidence obtained by the detective pursuant to that search warrant that substantiated that a shot had been fired by [the Defendant]."

After the State rested, the trial court granted the Defendant's motion for judgment of acquittal as to one count of aggravated assault of the Defendant's wife and two counts of domestic assault of the Defendant's wife. The court also granted the Defendant's motion for judgment of acquittal as to the count charging aggravated assault of Officer Freels, leaving the aggravated assault of Officer McMillan as the sole surviving charge.

The Defendant elected not to present proof. The jury found the Defendant guilty of aggravated assault with a deadly weapon. The Defendant was represented by a successor attorney at the sentencing hearing and the motion for a new trial. At the sentencing hearing, the trial court denied the Defendant's application for judicial diversion and sentenced him to serve three years as a Range I, standard offender. At a subsequent hearing at which trial counsel testified as a witness, the court denied the Defendant's motion for a new trial. This appeal followed.

# I

## Failure to Disclose Evidence

The Defendant contends that he was denied his due process right to a fair trial when the State failed to provide exculpatory evidence, as compelled by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He points to various documents created by law enforcement officers, including witness statements and investigative reports, and to photographs of Officer McMillan's injuries taken at the hospital shortly after the crime. The Defendant argues that these documents contained material impeachment evidence which, due to its nondisclosure, was unavailable to him at the trial. The State responds that the Defendant's claim is without merit because he has failed to establish that the undisclosed evidence was material. We agree with the State.

At the hearing on the motion for a new trial, the Defendant presented evidence related to his allegations that the State had violated *Brady* in failing to disclose favorable evidence and that he had received the ineffective assistance of counsel[5] because trial counsel had not diligently pursued the disclosure of this evidence. Trial counsel testified at the hearing that the defense trial strategy had been to illustrate that the prosecution resulted from "what law enforcement thought happened initially." Counsel said, "I thought we were still here because of Officer [McMillan] and that he was adamant that [the Defendant] pointed a gun at him." Counsel characterized the case as "incredibly contentious." He agreed that the case "was ultimately a credibility contest" regarding Officer McMillan's testimony that he saw the Defendant point a gun.

Trial counsel testified that, before the preliminary hearing, he had heard "rumblings" that Officer McMillan had not been shot but that he received no information to this effect from the District Attorney General's office or from law enforcement. He said that on the day of the hearing, one of the prosecutors gave him a laboratory report which stated that no gunshot residue had been found on Officer's McMillan's pants. Counsel said the prosecutor told him that the State now theorized that Officer McMillan had not been shot. Counsel said that the general sessions judge dismissed "domestic related charges" but bound over to the grand jury the "attempted murder cases . . . under the theory that pointing a gun was a substantial step towards commission of first degree murder."

Trial counsel testified that the discovery process in this case had been different than what he typically experienced. He said most cases involved "basically open-file discovery" but that in this case, it became clear that one of the prosecutors "was deciding what [counsel] needed." Counsel said one of the prosecutors told him in December 2020 that

---

[5] The trial court denied relief on the Defendant's ineffective assistance of counsel claims. The Defendant has not appealed the court's ruling.

no "video footage" existed. Counsel said that, after he filed his discovery request and received the State's response, he thought items he needed were missing. He said he spoke with one of the prosecutors, who told counsel that the State would not be providing the dispatch report and that interviews of Officer McMillan were *Jencks* material and would not be provided in pretrial discovery. *See Jencks v. United States*, 353 U.S. 657 (1957); Tenn. R. Crim. P. 26.2(a).

Trial counsel testified that he received a witness list "and a couple of other items" from the prosecutor. A printout of an email dated January 17, 2022, was received as an exhibit and contained a list of nineteen potential State's witnesses. The email also stated that a list of physical evidence from the crime scene was attached and that photographs of this evidence had already been provided. The list of evidence is not included in the appellate record. Regarding the list of potential witnesses, counsel said he did not have information about most of the witnesses. Counsel said he had been provided with the interviews of the Defendant's wife and son and with affidavits from Officers Swafford, Freels, and McMillan. Counsel said he had no written statements but that he had the affidavit of complaint, which contained some statements. Counsel said he had a "cruiser video" related to the Defendant's transportation to a hospital for concussion symptoms.

Trial counsel testified that he filed a specific discovery request in February 2022, in which he sought video evidence from the law enforcement officers who had been at the scene, the dispatch report, Officer McMillan's hospital records, TBI interviews and summaries, and other recorded interviews. Counsel said it was apparent that he had not been provided with most of the TBI file. Counsel said he twice contacted one of the prosecutors to try to determine a mutually agreeable date for a hearing on the discovery motion but that the prosecutor never responded. Counsel said the absence of the items for which he sought disclosure negatively impacted his ability to prepare the defense.

Trial counsel testified that, on February 17, 2022, the trial court and the attorneys had a telephone conference about his motion for specific discovery and a motion to continue, with the trial scheduled to begin on February 23. Counsel said the State took the position that defense counsel "was too late," that it had complied with Tennessee Rule of Criminal Procedure 16 regarding discovery, and that it opposed a continuance. Counsel said, however, that the State agreed to provide some of the requested discovery items. When asked about a court order reflecting the court's ruling, counsel said, "It was more informal." Counsel said the court denied his motion for a continuance. Counsel said that, after the conference call, he received the Defendant's son's 9-1-1 call, the dispatch report, and Officer McMillan's medical records. Counsel thought he also received *Jencks* material, which included reports from Officers Zach Cochran, Jesse Wilkey, and Michael Green; audio recordings of the June 5, 2020 TBI interviews of Officers Freels and Swafford; and the audio recording of Detective Hall's June 8, 2020 interview of Officer McMillan. Officer Green's report, Officer Wilkey's report, Officer McMillan's medical

-11-

records, and the audio statements were received as exhibits. Counsel said the State's late disclosure of these discovery items impaired his ability to prepare for the trial.

The trial court interjected, "My recollection is I instructed [the assistant district attorney general] to immediately turn over all requested discovery and if he failed to do so there'd be a problem and I would grant the continuance."

Trial counsel testified that, after receiving the documents in response to the telephone conference, he suspected he still had not been provided with some TBI report summaries and interviews. Counsel said he did not trust that the prosecutor was being truthful with him about some items. Counsel said he was unsure of the items which the prosecutor "was withholding from me that [were] in [the prosecutor's] possession and whether [items] simply did not exist." Counsel thought the prosecutor "was just deciding [defense counsel] did not need" some items.

Trial counsel testified that he did not request *Jencks* material after the State's witnesses testified at the trial because he thought he had already received the *Jencks* materials. Counsel said the first time he learned that Officer McMillan had given a statement to the TBI was when Officer McMillan testified to this fact at the trial. Counsel said he never received Officer McMillan's TBI statement during his representation of the Defendant.

The parties stipulated that photographs of Officer McMillan's injuries taken when he was treated at the hospital were in the State's possession but were not provided to trial counsel. The photographs were received as an exhibit. Trial counsel testified that he did not receive these photographs before the trial and that he saw them for the first time on the day before the motion for a new trial hearing.

The defense submitted the TBI file that was in the State's possession, which was received as an exhibit without objection. Trial counsel testified that he had received the following documents from the exhibit: a narrative report of an officer who retrieved Officer McMillan's clothing from the hospital, a report and attached evidence log from the crime scene, and a diagram of the scene. Counsel said he had not received the remaining documents from the exhibit, which consisted of: a summary prepared by TBI Agent Kevin Reagan regarding his response to the scene and the initial, on-scene investigation; a cover sheet for the diagram of the scene; interview summaries for Agent Reagan's interviews of the Defendant's wife, the Defendant's son, Officer Freels, Officer Swafford, and the Defendant; a consent to search the Defendant and his wife's home signed by the Defendant's wife; and a crime scene investigative summary completed by Agent Reagan. Referring to a notation in the TBI file regarding Agent Herron's having met with Officer McMillan at the hospital, counsel agreed that this meant a statement was likely taken and that, if he had received the full TBI file in discovery, he could have used the information

-12-

to try to obtain Officer McMillan's statement to Agent Herron. Counsel said he had not learned that Officer McMillan spoke to a TBI agent until Officer McMillan testified to this fact at the trial.

The defense also submitted documents generated by Detective Hall that were in the State's possession before the trial, and they were received as an exhibit without objection. Trial counsel testified that he did not receive these documents during his representation of the Defendant. Counsel said a document in this exhibit reflected that on June 8, 2020, Detective Hall thought that Officer McMillan had been injured by a mirror in the hallway and had not been shot. Counsel said he had been unaware that anyone in law enforcement had known before the TBI laboratory report was generated that Officer McMillan had not been shot. Counsel said that if he had been provided with this information, it would have benefitted his cross-examination of the officers who testified at the trial. He said he would have asked if the officers had discussed this theory with their supervisors and if they had made efforts to have the Defendant's charges "adjusted." Counsel said that he could have used this statement to impeach Detective Hall's refusal at the trial to state affirmatively that Officer McMillan had not been shot. In counsel's opinion, these documents were withheld intentionally to impair his cross-examination of law enforcement officers.

Reports prepared by Detective Hall and Officers McMillan, Swafford, and Freels were received as exhibits without objection. When questioned by the trial court, defense counsel stated that these documents were in the possession of the State and were not provided to trial counsel. The prosecutor declined to stipulate that the documents were "withheld," stating that she did not have a record of what another prosecutor had provided to trial counsel. She stated, as well, that the State contended that some of the documents the defense claimed should have been provided to trial counsel were not subject to disclosure. The prosecutor stipulated that that the documents were in the State's possession before and during the trial. Trial counsel testified that he did not receive the previously introduced exhibits prepared by Detective Hall, Officer McMillan, Officer Swafford, and Officer Freels. Counsel opined that the statement prepared by Officer McMillan and Officer Swafford's report should have been provided in the *Jencks* material when the State had represented that it was providing all the *Jencks* material. Counsel said, "I think any time you have a report of an officer and they're going to be testifying that it's excellent cross-examination material and can affect impeachment and credibility."

Trial counsel acknowledged that the defense had been that the Defendant "just didn't do it" and that none of the information that had not been disclosed would have changed "the overall theory." Counsel said, however, that the records would have been relevant "to the overall investigation and how it was handled."

A document requesting forensic testing of Officer McMillan's pants was received as an exhibit by stipulation. The parties stipulated, as well, that the document had been in

the State's file "at the time." Trial counsel testified that he did not see this document during his representation of the Defendant and that he first saw it when successor counsel showed it to him in preparation for the motion for a new trial hearing. The document included Detective Hall's recounting of the lack of evidence of a bullet or fragment and stated, "We think it is possible that the officer fell kicking the door and cut himself on a shard of glass thinking he had been shot." Trial counsel said he could have impeached Detective Hall's testimony with this document. Trial counsel acknowledged that he had received the TBI laboratory report for the testing.

Dayton Police Detective Michael Green testified that, although he was listed a potential State's witness at the Defendant's trial, he did not know why he had been subpoenaed and had never talked to a prosecutor about any potential testimony. Detective Green said he had been at the scene on June 4, 2020, and had been outside the home to "provide cover" while other officers took the Defendant into custody. Detective Green said he had not spoken to witnesses. He said he had completed an offense report, which he gave to the TBI or the District Attorney General's office. He said he had not worn any recording equipment or had recording equipment in the car he drove that night. He said the department was in the process of obtaining new vehicle recording equipment at the time of the offense because much of the existing equipment was no longer functional. He was unaware of any lost or destroyed evidence in this case.

Rhea County Sheriff's Sergeant Steven Husky testified that, although he was subpoenaed as a State's witness at the Defendant's trial, he did not know why and had not been present at the Defendant's home on June 4, 2020. Sergeant Husky said he had been involved with execution of the search warrant at the Defendant's home. He said he had not written any reports or made any statements related to the case. He said some of the in-car recording equipment had not been operational at the time and that, to his knowledge, the sheriff's department had not had body cameras at the time. He said he had not been involved in pretrial meetings about the case.

When asked why he would have been listed as a State's trial witness, Rhea County Sheriff's Detective Charlie Jenkins testified that he had been present on the night the Defendant was arrested and had been involved in the search of the Defendant's bedroom. He said he had not written any reports or been interviewed as a result of his involvement at the scene. He was unaware of any law enforcement officers having audio or video recording equipment present at the scene. He was not involved in any conversations about "the importance of a conviction in this case." He had seen the broken mirror at the scene but did not recall any conversations about whether Officer McMillan had fallen and cut himself on the mirror.

Rhea County Sheriff's Sergeant Matt Rose testified that he did not know why he had been subpoenaed as a trial witness. He said he was a member of the SWAT team that

-14-

responded to the Defendant's home on June 4, 2020. He said he had been inside the Defendant's home after the Defendant was already handcuffed. Sergeant Rose thought the Defendant fell at the door to the home as officers took him outside. Sergeant Rose said the sheriff's department did not have body cameras but had patrol car dash cameras. He said he had not prepared any reports and had not taken or given any statements related to this case. He did not think the Defendant's case had been treated differently than any other.

Former Dayton Police Officer Sarah Freels, now a Maryville Police officer, testified that when she was a Dayton officer, she had a dash camera but that it did not always work. She said the department's equipment had been "very fidgety." She did not recall whether it had been operational on June 4, 2020. She said she had not worn a body microphone or other audio recording device. She did not recall being interviewed by the TBI on June 5 but recalled preparing a report about the incident. She agreed that she had not written in her report that the Defendant's wife had said the Defendant probably had a gun and that she first mentioned this fact at the trial. She said she was interviewed a second time, several months later, by the TBI or FBI but did not think the interview had involved a written statement.

Officer Freels testified that, when she heard a loud sound on June 4, 2020, she and Officer McMillan were backing away from the Defendant's bedroom door. She said Officer McMillan did not fall and did not recall whether he stepped back against the mirror.

Rhea County Sheriff's Officer Jesse Wilkey testified that his dash camera had not been activated on June 4, 2020, when he was at the Defendant's home. Officer Wilkey explained that the camera activated when he deployed the blue lights on his cruiser, which he had not done when he responded to the Defendant's home. He acknowledged that the camera could also be activated manually. He said that he had created a "written synopsis" of the incident and that he had been interviewed by the FBI.

Dayton Police Officer Eric Swafford testified that, on June 4, 2020, he stood near the hallway when Officers Freels and McMillan retreated from the Defendant's bedroom door. Officer Swafford said Officer McMillan was in the hallway when Officer Swafford heard the loud noise that he thought was a gunshot. He said he had been interviewed by the TBI on the night of June 4 and thought Officer Freels also had been interviewed. Officer Swafford did not recall if he created any documents related to the incident. He said that he was interviewed later by the FBI, that he did not create a written statement, and that he did not know if any written statements were generated from the interview. He said that his dash camera was not working on June 4 and that the Dayton Police did not have body cameras at the time.

Rhea County Officer McMillan testified that he had not worn a body camera when he responded to the Defendant's home on June 4, 2020. He did not recall if his dash camera

-15-

had been activated but said that it would not have recorded any relevant information if it had been activated because he had parked "a house down" and not in the Defendant's driveway.

When asked if he had been cut by a broken mirror on June 4, 2020, Officer McMillan testified, "I don't know." When asked if he had been shot on June 4, he again said he did not know. He did not recall being told by Detective Hall that in Detective Hall's opinion, Officer McMillan had been cut by a mirror. Officer McMillan said he did not disagree with the statement made by one of the prosecutors at the trial that he had been cut by a mirror.

Officer McMillan agreed that he gave a statement to a TBI agent on June 5 at the hospital, that he gave a statement to Detective Hall on June 8, and that he wrote a narrative that was attached to a report. He did not recall creating any other written statements.

The defense introduced as an exhibit a search warrant for evidence of "Criminal attempt to commit Criminal Homicide" at the Defendant's home and the June 10, 2020 affidavit of Detective Hall. Defense counsel stated that the statements of Detective Hall in the affidavit were inconsistent with the statement Detective Hall made "on the withheld report." Counsel noted that the affidavit was dated two days after the report in which Detective Hall opined that Officer McMillan had been cut by the broken mirror. In the June 10 affidavit, Detective Hall stated that, according to a statement taken from Officer McMillan, the Defendant pointed a gun at Officer McMillan and that "Officer McMillan retreated and [the Defendant] fired one round at Officer McMillan[,] striking him in the right rear of the leg. The bullet exited his leg." The affidavit also stated that Detective Hall previously observed a Glock pistol and loaded magazines in the Defendant's bedroom and that Detective Hall believed based upon his training, experience, and investigation that "the expended bullet and cartridge are located inside the residence." Detective Hall stated, "I am of the opinion and belief that the offense of Criminal attempt to commit Criminal Homicide . . . has been committed[.]"

The trial court denied relief on the Defendant's *Brady* claim, concluding that the undisclosed evidence was not material to the aggravated assault charge for which the Defendant was ultimately convicted. The Defendant argues on appeal that the trial court erred in failing to grant him a new trial based upon the nondisclosure of material evidence which could have been used to impeach the State's witnesses.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence

pertaining to his guilt or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

To show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

Evidence that provides value for impeachment of a state's witness is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see also United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The critical inquiry remains, though, whether the evidence was material. In this regard, the inquiry is whether a reasonable probability exists that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see Edgin*, 902 S.W.2d at 391 (op. on pet. for reh'g).

In *Kyles*, the Supreme Court observed:

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

When reviewing a trial court's ruling on a *Brady* claim, an appellate court conducts a de novo review with a presumption that the lower court's factual findings were correct. *State v. Thomas*, 687 S.W.3d 223, 253 (Tenn. 2024) (citing *Caughter v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)). The appellate court conducts a de novo review of the lower court's conclusions of law, with no presumption of correctness. *Id.*

-17-

The Defendant focuses, first, on the written statements of Officers McMillan, Swafford, and Freels and argues that the statements could have been used to impeach the officers about whether the Defendant pointed a gun at any of them. The Defendant recites minor discrepancies and ambiguities in the officers' statements and their trial testimony, as well as some facts testified to at the trial that were not mentioned in the reports. Nothing in the reports contradicted the testimony of Officers McMillan and Freels about their having seen the Defendant raising a gun toward them.

Second, the Defendant argues that Detective Hall's sworn statement in the search warrant affidavit about his opinion that Officer McMillan had been cut was at odds with Detective Hall's testimony at the trial that he did not "have enough evidence to prove that there was a shot fired," rather than an affirmative acknowledgment that the Defendant had not shot Officer McMillan. The record reflects that the search warrant, including the affidavit, was received as a trial exhibit and was thus evidence for the jury's consideration. The record also reflects that the State agreed to stipulate, "[N]o evidence [was] obtained by the detective pursuant to that search warrant . . . substantiated that a shot had been fired by [the Defendant]."

Third, the Defendant points to the photographs of Officer McMillan's wound, which the Defendant argues likely would demonstrate, even to a lay person, that the wound was a cut, not a gunshot wound. As we have observed, the State's trial theory was based upon the Defendant's using a gun in a threatening manner toward Officer McMillan, and the State acknowledged by stipulation that no evidence existed to support a gunshot theory.

Fourth, the Defendant argues that, had trial counsel known that Officer McMillan was interviewed by the TBI at the hospital, counsel "could have conducted further, possibly fruitful investigation as well as litigation about the failure to disclose this statement." The Defendant argues that counsel was limited in his cross-examination of Officer McMillan and unable to "explore inconsistencies" between Officer McMillan's TBI statement at the hospital and his later interview with Detective Hall.

The record reflects that the Defendant requested the information and that, despite agreeing to provide any outstanding discovery and to provide the *Jencks* material before the trial, the State failed to provide at least some items containing discoverable, favorable information. *See Edgin*, 902 S.W.2d at 389. Specifically, some of the undisclosed items were relevant to impeachment of the law enforcement witnesses. *See Johnson*, 38 S.W.3d at 56-57.

As for materiality, the trial court found, "[The undisclosed items] deal with the issue of the incorrect report of the shooting. This was not the issue tried to the jury nor was i[t] the action of which the defendant [was] accused of committing." The court concluded that information in the undisclosed items was not material. That is, the court could not conclude

-18-

that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Edgin*, 902 S.W.3d at 390-91 (op. on pet. for reh'g). The Defendant points to discrepancies between the State's witnesses' trial testimony and their statements and reports. None of these discrepancies, individually or collectively, are significant in view of the overall tenor of the trial, at which trial counsel ably cross-examined the State's witnesses about variances in the details of their respective recollections of and prior statements about the events at the Defendant's home on the evening of June 4, 2020. None of the undisclosed information is exculpatory of the crimes for which the Defendant faced trial, and particularly, the crime for which he was convicted. Trial counsel was also able to introduce the theory that the State was prejudiced against the Defendant and had pursued prosecution of him, despite the fact that no shot had been fired, based upon their desire to "cover up" law enforcement's initial misconception that Officer McMillan had been shot. Two officers testified that the Defendant raised a gun toward them when Officer McMillan kicked the bedroom door, and the Defendant said in his pretrial statement that he had a gun in his hands when Officer McMillan kicked the door. In his statement, the Defendant accepted the officers' belief at the time that he had fired the gun, protesting only that any discharge had been accidental. Any theoretical additional impeachment of the officers with inconsistent or previously unmentioned evidence about other details, such as how wide the door opened when Officer McMillan kicked it, how far away from the door the Defendant stood when the door opened, or whether Officer McMillan had a gun or a Taser when he kicked the door, fails to "'undermine[] confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

As for Detective Hall's statements in the search warrant affidavit, we again note that the search warrant, including the affidavit, was received as a trial exhibit and was thus evidence for the jury's consideration. With regard to the photographs of Officer McMillan's injury, again, the jury was not required to determine whether he was shot or cut in order to determine the Defendant's guilt or innocence. In any event, the prosecutor stated repeatedly during the trial that the State did not contend that the Defendant shot Officer McMillan. Having considered all the undisclosed evidence in conjunction with the evidence admitted at the trial, we conclude that the record supports the trial court's determination that the undisclosed evidence was not material. The court did not err in denying the motion for a new trial based upon the Defendant's *Brady* claim. The Defendant is not entitled to relief on this basis.

## II

### Juror Misconduct

The Defendant contends that the trial court erred in denying his motion for a new trial on the basis that the jury was exposed to extraneous, prejudicial information because

-19-

a juror with prior law enforcement experience injected legal definitions for the charged offense which were at odds with the jury instructions. As part of this contention, the Defendant argues that the court erred in declining to consider the written declarations of two jurors on the basis that they were not sworn affidavits. The State responds that the court did not err by not considering the declarations and in denying the motion for a new trial based upon the alleged but unproven juror misconduct. We agree with the State.

A criminal defendant is constitutionally entitled to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013). In reaching its verdict, the jury must rely only upon the trial evidence, which it weighs in light of its own knowledge and experience. *Adams*, 405 S.W.3d at 650 (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). If a jury has received extraneous prejudicial information or some improper outside influence has been asserted upon it, the verdict may be improper. *Id.*; *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984). "A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Adams*, 405 S.W.3d at 651 Tenn. 2013) (citing *Caldararo*, 794 S.W.2d at 740-41). When a party makes a showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a presumption of prejudice arises, which may be rebutted by evidence which explains the conduct or demonstrates it was harmless. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005); *Blackwell*, 664 S.W.2d at 689.

Relevant to such inquiries, Tennessee Rule of Evidence 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The Advisory Commission Comments to Rule 606(b) state that a juror may submit an affidavit in support of a motion for a new trial in limited circumstances, including "'extraneous prejudicial information' finding its way into the jury room." Tenn. R. Evid. 606(b) (Advisory Comm'n Cmts.). Likewise, the Advisory Commission Comments to

Tennessee Rule of Criminal Procedure 33, the rule governing motions for a new trial, state, "Affidavits provide a method for resolving factual issues, if the trial judge is satisfied that they adequately serve the purpose. The judge is not required to believe an incredible affidavit and may always require an evidentiary hearing with witnesses." Tenn. R. Crim. P. 33 (Advisory Comm'n Cmts.).

At the motion for a new trial, the Defendant offered the written declarations of two jurors as evidence of alleged improper extraneous information injected into the deliberations and considered by the jury. In these unnotarized declarations, the two jurors stated that a member of the jury with prior law enforcement training and experience had informed the jury of legal definitions which were at odds with the trial court's jury instructions and of law enforcement training and standards related to the officers' handling of the incident at the Defendant's home. The jurors said that they had relied on the information in reaching their verdict and expressed opinions that other jurors had relied on the former law enforcement juror's statements. The trial court permitted the documents to be received as exhibits for identification, but it declined to consider them, holding that they were unsworn statements and not affidavits or in-court testimony. The court also made the following findings relative to the merits of the Defendant's juror misconduct claim:

> [The juror who allegedly imparted extraneous information] was not a [law enforcement officer] at the time of this incident and stated he had no independent knowledge of this case. During the jury charge, the court provided the jury with all applicable law to consider and instructed them to only rely upon the court's instructions. The court also instructed the jury they are allowed to reflect upon their own experience, knowledge, and common sense. This is in the pattern jury charge.
>
> . . . .
>
> The court further finds that the evidence presented a[t] trial preponderates against any claim of an improper verdict. The jury charge of aggravated assault against a law enforcement officer by causing fear is fairly simple. The jury clearly believed the defendant pointed a gun at the officer, which by itself, was sufficient to obtain a guilty verdict beyond a reasonable doubt.

We begin with the Defendant's argument that the trial court erred in declining to consider the jurors' written declarations. The Defendant argues the declarations were admissible in lieu of the affidavits, based upon an order of our supreme court in effect at the time of the motion for a new trial hearing. As relevant here, this order provided for the use of "declarations under penalty of perjury as an alternative to a notary" in "court filings." *See In re: COVID-19 Pandemic*, No. ADM2020-00428, ¶ 10 (Tenn. Feb. 12, 2021) (order).

The State responds that the term "court filings" in the supreme court's order contemplates filings such as motions for extensions of time and similar documents. The State notes that the declarations fall short because they are not the sworn affidavits permitted by Tenn. R. Crim. P. 33. The State argues that, in any event, the court did not abuse its discretion in declining to consider the declarations because a trial judge may "require an evidentiary hearing with witnesses." *See* Tenn. R. Crim. P. 33(Advisory Comm'n Cmts.).

We have reviewed the supreme court's February 12, 2021 order and conclude that the jurors' declarations, which state that they are "declarations under penalty of perjury," were offered as "court filings" in lieu of affidavits and were within the ambit of the supreme court's February 12 order. The trial court should not have declined to consider them on the basis that they were not affidavits.[6]

That said, the Defendant has not shown that the trial court abused its discretion in declining to consider the jurors' declarations due to their contents. We conclude, as did the trial court, that the declarations did not contain admissible evidence under Rule 606(b). The jurors provided information about the alleged substance of the former law enforcement juror's statements, as well as information about the effect the alleged information had on two jurors' deliberations and verdict and their perceptions that the other jurors relied on the law enforcement juror's statements. Under the plain language of Rule 606(b), the only evidence which is admissible was that which was related to: (1) extraneous prejudicial information which was injected into the jury's deliberations, (2) improper pressure exerted on the jury by any outside party, and (3) an agreement "to be bound by a quotient or gambling verdict without further discussion." *See* Tenn. R. Evid. 606(b). Information about the jurors' deliberative process, including the effect of any extraneous information, was not permitted. *Id.* Based upon the allegations made in the declarations, the declarations were relevant only to the extent that they alleged that extraneous prejudicial information was injected into the deliberations.

Examination of the permissible information from the declarations reflects allegations that the former law enforcement juror provided the jury with: (1) legal definitions of aggravated assault and assault which varied from the trial court's jury instructions, (2) his opinion that the Defendant was guilty based on the definitions he provided, and (3) his opinion that the law enforcement officers involved in the incident at the Defendant's home had acted appropriately and would have been in fear when they saw

---

[6] The supreme court's February 12, 2021 order, including the provisions about declarations under penalty of perjury in lieu of notarized signatures, was rescinded by subsequent order on June 8, 2023. The motion for new trial hearing was held on March 29, 2023. We also note that the declarations were offered by the Defendant, not the State. As such, the Defendant's constitutional right to confront witnesses was not implicated. *See* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9; *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000).

a gun. Jurors are permitted to discuss their "generalized knowledge and experience." *Caldararo*, 794 S.W.2d at 742; *see State v. McAfee*, 784 S.W.2d 930, 933 (Tenn. Crim. App. 1989) (holding that a juror's alleged statement during deliberations about how long a criminal defendant would serve if convicted was not "extraneous prejudicial information").[7] We conclude that the former law enforcement juror's alleged opinions related to the Defendant's guilt and the propriety of law enforcement's response to the incident were not extraneous prejudicial information.

Regarding the alleged legal definitions provided by the former law enforcement juror, we conclude that this was, likewise, not extraneous prejudicial information. This was information based upon a juror's life experiences. At most, the former law enforcement juror stated his opinions as to the law related to the submitted offense and as to the propriety of the response of the officers on the scene. This was not information which was injected to the jury from an external source. *See State v. Anderson*, 748 S.W.2d 201, 205 (Tenn. Crim. App. 1985) (holding that the defendant was not entitled to a new trial based upon a juror's allegedly advising the jury about parole eligibility because the jury's "use of . . . extrinsic knowledge in the deliberative process does not fall into the category of extrinsic influence"),[8] *overruled on other grounds by State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993). We conclude that the jurors' written declarations submitted at the hearing did not contain evidence which was admissible pursuant to Rule 606(b). The trial court did not abuse its discretion in declining to consider the declarations.

As to the merits of the Defendant's issue, the trial court found that the juror with prior law enforcement experience had no personal involvement in the incident which was the subject of the trial. The court also found that it had instructed the jury as to the applicable law, that they could reflect upon their own experience, knowledge, and common sense," and that the court's instructions regarding the law were to be considered exclusively. The court concluded that the Defendant had failed to show that an improper verdict had been returned. The record supports this determination. The Defendant is not entitled to relief on this basis.

---

[7]Although the trial and appellate decision in *McAfee* predated Tennessee's adoption of the Tennessee Rules of Evidence, Tennessee had already judicially adopted the federal counterpart, Federal Rule of Evidence 606(b), which was substantially similar, except that it did not contain Tennessee's rule about a jury's agreement to be bound by a quotient or gambling verdict. *See Blackwell*, 664 S.W.2d at 688-89 (adopting Fed. R. Evid. 606(b)).

[8] As with *McAfee*, *supra* n.7, *Anderson* predated the adoption of the Tennessee Rules of Evidence, but it was governed by the supreme court's prior adoption of Federal Rule of Evidence 606(b) in *Blackwell*.

# III

## Sentencing

The Defendant contends that the trial court abused its discretion in denying judicial diversion and in imposing incarceration. The Defendant argues, "The trial court abused its discretion by categorically ruling that displaying a weapon at a law enforcement officer will result in a term of imprisonment, regardless of the individual circumstances of the case." The State responds that the court acted within its discretion. We agree with the State.

At the sentencing hearing, the defense requested that the trial court take judicial notice of witness testimony at a prior bond revocation hearing and of the Defendant's supporters in the courtroom. The court took judicial notice of the prior testimony and of the presence of the Defendant's supporters.[9]

The Defendant read a prepared statement, in which he said that he took responsibility for his actions on June 4, 2020, and that he regretted and was sorry for his conduct. He acknowledged that his words and actions exacerbated the situation. He said he knew he "did plenty wrong" on June 4 and hoped that everyone affected "can be returned to their normal life and put this behind them."

The Defendant testified that he served a combined twenty-two years in the Air Force and Air National Guard, until he was injured in the line of duty and retired medically in 2012 based upon a rotator cuff injury, a back injury, chronic pain, and depression. He said that he was a caregiver to his children and assisted other family members after his medical retirement, that he did volunteer work, and that his wife worked fulltime. He said his marriage had been good for twenty years but became troubled in 2020, and they began marital counseling. He acknowledged that he "handled it badly." He also acknowledged that his actions in the present case harmed his children and his wife. He said that he had been in custody for about sixty days, during which time he had become more empathetic

---

[9] The transcript of the bond revocation hearing reflects that, after the Defendant's conviction but before sentencing in the present case, the Defendant was charged with new assaultive and resisting arrest offenses related to an altercation with first responders when his wife had taken an overdose of prescription medication. The Defendant and another individual were performing CPR, and the altercation ensued when a police officer instructed the Defendant to stop mouth-to-mouth resuscitation because the officer wanted to administer Narcan as a precautionary measure. The trial court found by a preponderance of the evidence that the Defendant had violated the terms of his release and revoked his bond. The record reflects, however, that the underlying charges which formed the basis for the bond revocation were later dismissed.

-24-

toward others and had studied the Bible. He said that by seeing the work of the jailers, he had grown to appreciate the work of law enforcement.

The Defendant testified that he would like to continue his treatment with the Department of Veterans Affairs (VA), which included treatment with a psychologist, a psychiatrist, and available eight-week courses. He said that since the incident which led to his conviction in the present case, he had completed three such VA-sponsored courses, which included mindfulness training. He said he and his wife were still participating in marital counseling. He said that he and his family attended church and that he and his wife taught Sunday School and had been involved with youth ministry.

The Defendant testified that having a felony conviction would mean "the first 57 years of [his] life [would be] wiped out" because he would be disenfranchised, unable to participate in activities such as deer hunting or going to a person's home if the person owned a firearm, and he would harbor shame for his actions. He was unsure of the effect of a felony conviction on his VA benefits and Department of Defense retirement benefits.

The Defendant acknowledged that he had given media interviews and made social media posts about the June 4, 2020 incident.

Three letters attesting to the Defendant's good character were received as exhibits.

The presentence report reflected that the fifty-seven-year-old Defendant had graduated from high school and had taken some college classes. He had completed two Air Force enlistments and had worked in manufacturing. He reported no substance use disorders and said he drank alcohol socially. At the time the report was prepared, he had pending criminal charges for aggravated assault against a first responder and resisting arrest, but other documentation provided at the hearing showed that these charges were dismissed in general sessions court. The Defendant had no prior convictions other than his conviction in the present case. Officer McMillan stated in the victim impact portion of the presentence report that he had participated in mental health counseling after the incident and that the Defendant had made derogatory statements about the victim and law enforcement on social media and to the news media. The victim said the Defendant repeatedly sat near the victim's wife at football games to "remind her of the man who attempted to change her entire life." The risk and needs assessment stated that the Defendant's risk level was low. An Air National Guard Report of Separation and Record of Service was attached to the presentence report, but the copy which has been provided to this court in the appellate record is largely illegible. *See* T.R.A.P. 24(e) (correction or modification of the appellate record).

After receiving the evidence, the trial court found that the Defendant was a Range I offender and that the enhancement factor applied for committing aggravated assault against

a law enforcement officer who was performing an official duty at the time of the offense. *See* T.C.A. § 40-35-114(19) (Supp. 2023). The court rejected the Defendant's bid for mitigation because the Defendant was suffering from a mental condition which significantly reduced his culpability for the offense and because he committed the crime under unusual circumstances which indicated he lacked a sustained intent to violate the law. *See id.* § 40-35-113(8), (11) (Supp. 2023). The court allowed the "catchall" mitigating factor based upon the Defendant's character, family ties, "dependence upon the family," and lack of prior criminal convictions. *See id.* at (13).

The court made the following findings in denying the Defendant's application for judicial diversion:

> The Court must consider the factors . . . set forth in *Parker* and *Electroplating* in determining whether or not diversion should be granted or denied. The Court is very familiar with those factors and I have applied those factors here in this case.
>
> Factor (a) the accused's amenability to correction. I think he can be corrected. I think 60 days in jail may have woke him up a little bit and opened his eyes to his behavior that night, and he has a lifetime of good behavior and service to our country, so I do think he is amenable to correction, so that factor would favor him in diversion.
>
> (b) The circumstances of the offense, and I will come back to that one, because that is the one that weighs the most in my analysis.
>
> (c) The accused's criminal record. He has no previous criminal record, so that factor favors [the Defendant].
>
> (d) The accused's social history. Again, there's tons of proof in the record that he has a good reputation amongst his family and the community for many, many, many years, and also honorably served our country for many, many years, and the Court gives him credit for that and that factor favors [the Defendant].
>
> (e) The accused's . . . physical and mental health. Again, there's testimony here about some depression and needing to seek counseling and so forth. There wasn't a whole lot of medical proof put on about that, but I can understand, . . . I have family and friends who served in the military and served over seas. I was not brave enough to serve, so I appreciate your service to our country and I understand being in war zones can cause different . . . mental health issues. It can. It's documented and I've seen it myself with

family and friends, so I understand that factor and that may be applicable to you today. There wasn't a lot of medical proof for the Court to look at.

. . . .

(f) The deterrence value to the accused as well as others. And this one is very important. This factor goes against [the Defendant]. The deterrence value is huge in this case. . . . I haven't seen the media coverage in this case, I haven't read anything or seen videos of it, I think that would violate what I'm suppose[d] to do on the bench and just hear what I've heard in court was presented as evidence, but it's known to the Court that somehow this got blown up in the media. I don't know who caused that, I don't know who fanned the flames, I don't know who caused that to happen, but now it is in the public eye and so people are watching to see what happens in this case, and that's one reason why the deterrence value to this is important to the Court. There are some actions that can be excused and forgiven and there's some actions that we have to send a message to the community that we're not going to allow that type of behavior, and pointing a gun at a law enforcement officer is the type of behavior that I'm trying to deter in this community. So that factor goes against you.

That essentially piggybacks and also expands upon factor (g) Whether judicial diversion will serve the interest of the public as well as the accused. Of course, it'll serve your best interest and keep a felony conviction off your record and so forth and maybe have a chance to move on, but it will not serve the community or the public to grant you diversion. That sends a horrible message to our community, that you can point a gun at a law enforcement officer, call the law enforcement officers out to your home, then point a gun at them and you might get . . . diversion and you might get probation, you might get a slap on the wrist, might get it excused. That's a horrible message to send to the community and now because this case somehow is in the public eye[,] people are looking to see what happens, so that factor goes against you.

I have weighed all the factors and reached this determination. I have stated that the factors – I'll go back to factor (b) that I was talking about with factors (f) and (g). Factor (b) is the circumstances of the offense, and again, this is one of those situations where it's a different ballgame and it's not excusable, but you run into somebody at the Walmart parking lot and you got in road rage with him and you get in a fight and you pull a gun out and point it at him, that's a horrible thing to do, but it's a situation that where maybe we can do – craft some kind of remedy to keep it off your record and let your clean record persist. It's not the situation here. It's at your home, law

-27-

enforcement officers were called out there and you pointed a gun at them. The circumstances of the offense, factor (b), factor (f) and factor (g) outweigh all other factors in my determination here today to deny your request for judicial diversion.

They outweigh all the other factors greatly based upon the circumstances of the offense and the deterrence value to the community.

Turning to the question of the appropriate sentence for the Defendant's conviction, the court found that a three-year sentence was appropriate and ordered the Defendant to serve it in the Department of Correction. The court made the following findings in denying an alternative sentence:

In probation considerations the Court must consider the following: The defendant's physical, mental condition and social history that's been testified to. He maybe has some mental illness or depression based on service and everything he did for our country. His social history seems to, you know, he's raised two kids, has been in church, has family involvement here in the community, that favors you, sir.

The facts and circumstances surround the offense and the nature and circumstances of the criminal conduct involved. This goes back to what I was just saying, the behavior you exhibited that night is very, very difficult for me to excuse or more for me to wave away by just putting you on probation, but I'm going to go through the factors and do my analysis.

The prior criminal history of the defendant of lack thereof, that favors you[.]

The previous actions and character of the defendant, that favors you, as well.

Whether or not the defendant might reasonably be expected to be rehabilitated and the defendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation the defendant will commit another crime. . . .  I think you can be rehabilitated and this seems to be an isolated incident in your life, but it's just a really, really bad isolated incident. I don't think it's a high risk you're going to commit another crime if I put you on probation. Something happened out there that night that was testified to when the officers – I've revoked your bond on a separate incident involving law enforcement officers at your

-28-

house, another charge of aggravated assault, that's been dismissed, but I don't think that factor goes against you, sir.

Whether or not it reasonably appears the defendant will abide by the terms of probation. You probably would.

And whether or not interest of society [sic] and being protected from possible future criminal conduct of the defendant are great. I don't think that you're a grave danger to our society. You seem to be, if anything, you're a danger to law enforcement that comes to your house, but I don't think there's – there's not a history of you being a danger to society, so I think that factor favors you, sir.

And whether not measures less restrictive than confinement, that's not even applicable to you in this case.

Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense, and it would.

Again, pointing a gun at a law enforcement officer is an extremely serious offense that we have to set the community standard for in this court that we're not going to allow. We're not going to forgive it and we're not going to sweep it under the rug. There has to be punishment that is commensurate with the seriousness of that offense.

Whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses, it is. People have to know that in Rhea County, Tennessee, if you point a gun at a law enforcement officer you will be a convicted felon and you will serve some jail time. That's the message that we need to send in our community and that's what I was put here to do.

And whether or not this offense is particular enormous, gross or heinous, again, I've been on the bench eight years. I deal with murderers and people who rape children, so I've seen – I deal with the worst of the worst, and you do not fall under that category, sir, but your offense that night was extremely dangerous and one that we cannot easily look over in this community. We have to send a message that we will not tolerate people pointing guns at law enforcement officers.

With all of that being said, the Court sentences you to serve three years in the Tennessee Department of Corrections [sic] as a Range I Offender[.]

### A. Judicial Diversion

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2022). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice and the interests of the public and the defendant. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent caselaw affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

Likewise, a trial court's reliance upon an irrelevant factor may result in an abuse of discretion. *See State v. McKim*, 215 S.W.3d 781, 787 (Tenn. 2007). However, a court's mere consideration of an irrelevant factor does not result in an abuse of discretion because "it is the undue consideration of an irrelevant factor that is prohibited." *Stanton v. State*, 395 S.W.3d 676, 687 n.2, 691 (Tenn. 2013). A "trial court is not required to recite on the record all of the . . . factors; however, the record should reflect that the trial court considered all of the factors in rendering its decision and that it 'identified the specific factors

applicable to the case before it.'" *State v. Dycus*, 456 S.W.3d 918, 930 (Tenn. 2015) (quoting *King*, 432 S.W.3d at 327).

In the present case, the trial court considered each of the *Parker* and *Electroplating* factors in turn, identified the ones to which it afforded greater weight, and explained its reasoning for denying diversion. We afford its determination a presumption of reasonableness. *King*, 432 S.W.3d at 327.

The Defendant's argument attempts to characterize the trial court's rejection of judicial diversion as a prohibited "categorical[] ruling" against diversion for an offense which the legislature has deemed eligible for diversion. He argues that the court "categorically considered the offense to be unsuitable for diversion." Indeed, caselaw holds that a court may not rely on the existence of an element of the offense or a defendant's commission of a particular offense to deny diversion or alternative sentencing for an offense for which such is a statutory option. *See, e.g.*, *Dycus*, 456 S.W.3d 928-29 (stating that "'[i]t is within the General Assembly's discretion to determine which offenses it deems ineligible for diversion, and the General Assembly has not done so in this instance. . . . [Therefore,] we cannot, and will not, read into the statutes an exclusion not specifically stated therein.'" (quoting Court of Criminal Appeals' opinion in the same case)); *State v. Bingham*, 910 S.W.2d 448, 454-55 (Tenn. Crim. App. 1995) (holding that the trial court could not categorically deny an alternative sentence on the basis that a death was involved in view of the legislature's providing that alternative sentencing was an available option for a vehicular homicide sentence), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000).

The Defendant conflates the cases holding that a trial court may not categorically reject a defendant's application for judicial diversion because the court does not believe diversion should be available for a statutory offense with the situation here. In this case, the court rejected the Defendant's application for diversion based upon the particular facts of the Defendant's conduct during the commission of the offense. This distinction is key. In the present case, the record reflects that the trial court was influenced heavily by the particular circumstances of the aggravated assault committed by the Defendant, not that the court rejected, as a wholesale proposition, the possibility of judicial diversion *because* the Defendant had been convicted of aggravated assault and the court disagreed that diversion should be an available option for any defendant convicted of aggravated assault. Granted, the court relied on the Defendant's offense having been committed against a law enforcement officer, which was not an element of the offense but was a circumstance of the particular offense this Defendant committed. The court addressed the reasons it found this distinction compelling, in contrast with other aggravated assaults.

The trial court made findings as to each of the *Parker* and *Electroplating* factors, and the record supports its determinations in each regard. In weighing the factors, the

court found that three factors outweighed the others: the circumstances of the offense, the deterrence value to the defendant and others, and whether judicial diversion would serve the ends of justice and the interests of the public and the defendant. *See Electroplating*, 990 S.W.2d at 229; *Parker*, 932 S.W.2d at 958. In this determination, the court relied on the facts of the case, in which the Defendant raised a gun and approached a law enforcement officer who was at the Defendant's home in response to a domestic violence report. We note, as well, that the Defendant's son was inside the home, and his wife was outside on the porch. Also, the Defendant was aware that the people present were law enforcement officers and not criminal intruders. The court found that the case had received substantial media attention and found that granting diversion would send the wrong message to the public regarding the consequences of conduct such as the Defendant's. The court explained its findings and its rationale in weighing some factors more heavily than the ones which favored the Defendant. Because the Defendant has not shown that the court abused its discretion in denying judicial diversion, he is not entitled to relief on this issue.

### B. Manner of Service of the Sentence

This court reviews challenges to the length and manner of service of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The Sentencing Reform Act provides:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C). If probation is denied solely on the basis of the circumstances of the offense, they "must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring a sentence other than probation. *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (citations omitted). This court has recognized, "This standard has essentially been codified in the first part of T.C.A. § 40-35-103(1)(B) which provides for confinement if it 'is necessary to avoid depreciating the seriousness of the offense.'" *Id.* at 375.

As he argued with judicial diversion, the Defendant claims that the trial court categorically denied alternative sentencing because the Defendant raised a gun and approached a police officer, which he claims is contrary to Tennessee law permitting alternative sentencing for defendants convicted of aggravated assault. Again, we disagree. The court did not deny alternative sentencing because it disagreed categorically with the legislative mandate that alternative sentencing be available for qualified defendants convicted of aggravated assault. The court denied alternative sentencing based upon the particular facts of the aggravated assault the Defendant committed. Such is the very essence of our Sentencing Act, which requires the trial court to consider all the relevant facts and circumstances of the case before it to formulate a sentence which is "justly deserved in relation to the seriousness of the offense," ensures "fair and just treatment" of defendants, and "prevent[s] crime and promote[s] respect for the law." T.C.A. § 40-35-102(1)-(3).

In denying an alternative sentence and imposing incarceration, the trial court found that, although the Defendant would likely comply with the terms of a sentence involving release and was at a low risk of reoffending, a probation sentence would unduly depreciate the seriousness of the offense. The court was gravely concerned about the facts of the case

-33-

and characterized raising a gun toward a law enforcement officer as "an extremely serious offense" which compelled "punishment that is commensurate with the seriousness of that offense." The court also found that confinement of the Defendant was particularly suited to deter others from such unlawful conduct. Finally, the court found that the Defendant's criminal conduct had been "extremely dangerous" and not something that should be easily overlooked. The court said, "We have to send a message that we will not tolerate people pointing guns at law enforcement officers."

Upon review, we conclude that the record supports the trial court's factual findings. The court engaged in a thorough and thoughtful review of the applicable law, in conjunction with the facts of the case, and it determined that the Defendant's conduct had been egregious, extreme, and dangerous and that this factor outweighed other considerations favoring probation. *See Hartley*, 818 S.W.2d at 374-75. The court also found that the need for deterrence of others in engaging in similar conduct compelled that the Defendant not receive probation and, instead, serve his sentence in the Department of Correction. *See* T.C.A. § 40-35-103(1)(B). The Defendant has not shown that the court abused its discretion in ordering him to serve his sentence. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE